## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| JUDITH DIANE GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:11-0374 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Summary Judgment (Document Nos. 10 and 11.), Plaintiff's Reply (Document No. 14.), Plaintiff's Memorandum Regarding Supplemental Authority (Document No. 15.), and Defendant's Brief in Response ro Plaintiff's Memorandum Regarding Supplemental Authority. (Document No. 16.)

The Plaintiff, Judith Diane Gibson (hereinafter referred to as "Claimant"), filed an application for SSI on November 16, 2007 (protective filing date), alleging disability as of January 1, 2007, due to "chronic anxiety disorder, panic attacks, hypertension, back problem, degenerative disc disease, type 2 diabetes, chest pain, Bell Pals[]y, high cholesterol, anemia, and leg/feet edema." (Tr. at 18, 158-65, 180, 184.) The claims were denied initially and upon reconsideration. (Tr. at 64-

66, 72-74.) On October 21, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 75.) The hearing was held on September 23, 2010, before the Honorable Michelle Wolfe. (Tr. at 36-61.) By decision dated November 12, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-35.) The ALJ's decision became the final decision of the Commissioner on April 18, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On May 25, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of

disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) Rating the degree of functional limitation. (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

3

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since November 16, 2007, the application date. (Tr. at 20, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from major depressive disorder, generalized anxiety disorder, degenerative joint disease of the bilateral knees, obesity, diabetes, and provisional borderline intellectual functioning, which were severe impairments. (Tr. at 20, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 21, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity

> to perform light work as defined in 20 CFR 416.967(b) except she is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing, but never on ladders, ropes or scaffolds. She should avoid concentrated exposure to cold and heat, vibrations and hazards. She could not perform complex jobs, but can do simple routine tasks. She would be limited to low stress jobs, defined as only occasional decision making and occasional changes in the work setting, working with things rather than people and occasional interaction with co-workers.

(Tr. at 24, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 34, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a hand packer, machine off bearer, and house cleaner, at the light level of exertion. (Tr. at 34, Finding No. 9.) On this basis, benefits were denied. (Tr. at 35, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on April 24, 1961, and was 49 years old at the time of the administrative hearing, September 23, 2010. (Tr. at 34, 41, 158.) Claimant had a sixth grade, or marginal, education and was able to communicate in English. (Tr. at 34, 183, 189.) Claimant had no past relevant work. (Tr. at 34, 43.)

The Medical Record

The Court has reviewed all evidence of record, including the medical evidence, and will discuss it below as it relates to Claimant's arguments.

Mental Impairments:

*Michael McDaniel - Psychological Evaluation & Intellectual Testing*:

On January 28, 2008, Michael A. McDaniel, M.A., a licensed psychologist, conducted a psychological evaluation of Claimant at the request of the West Virginia Department of Health and Human Resources ("DHHR") to determine the appropriateness of a medical card. (Tr. at 384-92.) Claimant reported a sixth grade education and that she neither obtained her Generalized Equivalency Degree nor worked outside the home. (Tr. at 390.) She reported problems with anxiety, panic attacks, and depression. (Id.) On mental status exam, Mr. McDaniel observed that Claimant was cooperative and fully oriented, with a depressed mood. (Tr. at 391.) She exhibited clear and generally relevant speech, somewhat impaired attention and concentration, intact memory, possibly limited abstract verbal reasoning abilities, fair judgment and insight, and a variable appetite. (Id.)

Intellectual testing revealed a full scale IQ of 58, a verbal score of 55, and a performance score of 66. (Tr. at 391.) Claimant's scores placed her in the mildly mentally impaired range of intellectual ability, and Mr. McDaniel opined that Claimant was functioning at a significantly below average level. (Id.) Mr. McDaniel diagnosed major depressive disorder, panic disorder, and borderline intellectual functioning, and assessed a GAF of 45.[1] (Tr. at 392.)

---

[1] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100.  GAF of 41-50 indicates that the person has serious symptoms, or serious impairment in social, occupational or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

*Elizabeth Durham - Mental Status Exam & Intellectual Testing*:

On February 14, 2008, Elizabeth Durham, M.A., a licensed psychologist, performed a mental status examination on February 14, 2008. (Tr. at 355-59.) Claimant reported sleep difficulties, a fair appetite, crying episodes, a dysphoric mood, anxiety, panic attacks, and an inability to be around a crowd of people. (Tr. at 355-56.) She indicated that she completed the sixth grade and then dropped out of school at the age of 13. (Tr. at 356.) On mental status exam, Ms. Durham observed that Claimant had a good attitude and was cooperative, interacted appropriately, maintained normal eye contact, gave adequate verbal responses, spontaneously generated conversation with normal tone and pace, was fully oriented, had a dysphoric mood and restricted affect, had fair insight, and had normal judgment, memory, and concentration. (Tr. at 357.) She diagnosed major depressive disorder, recurrent, moderate; and generalized anxiety disorder. (Id.) Ms. Durham opined that Claimant's social functioning, persistence, and pace were within normal limits, and that she was capable of managing her finances. (Tr. at 358.)

Ms. Durham conducted a further evaluation and intellectual testing on September 20, 2008. (Tr. at 407-12.) Claimant reported sleep difficulties, crying episodes, and a dysphoric mood. (Tr. at 408.) Claimant reported that she dropped out of school after having completed the sixth grade. (Id.) On mental status exam, Claimant exhibited a good attitude and was cooperative, interacted appropriately, maintained normal eye contact, gave adequate responses, spontaneously generated conversation, relevant and coherent speech, was oriented fully, present with a dysphoric mood and restricted affect, and had normal thought processes and content, fair insight, normal judgment and memory, and normal concentration. (Tr. at 409.) She achieved a verbal IQ score of 58, a performance score of 52, and a full scale score of 51. (Id.) Ms. Durham noted that the results were invalid because Claimant put forth little effort on testing and gave up easily, without attempting to

have answered more difficult questions. (Tr. at 410.) She also noted that Claimant obtained her driver's license by written and driving exam. (Id.)

Results of the WRAT-3 demonstrated that Claimant read and spelled at a kindergarten level and performed math at a first grade level. (Tr. at 410.) Ms. Durham declared that the results were invalid. (Id.) Ms. Durham diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and borderline intellectual functioning, provisionally. (Id.) She opined that Claimant's social functioning, persistence, and pace were within normal limits. (Tr. at 410-11.)

*Dr. Harlow - State Agency Reviewing Psychologist*:

Dr. Jeff Harlow, Ph.D., a licensed psychologist, completed a form Psychiatric Review Technique ("PRT"), on February 29, 2008. (Tr. at 360-73.) Dr. Harlow opined that Claimant's depressive and anxiety disorders were non-severe impairments and resulted in no functional limitations. (Tr. at 360-65, 370.)

*Dr. Hoback Clark - Opinion*:

On March 14, 2008, Dr. H. Hoback Clark, M.D., a reviewing psychiatrist under contract with the DHHR, completed a form Mental Disability/Incapacity Evaluation, on which she opined that Claimant had a mental impairment that met or equaled the listing of impairments, which rendered her mentally disabled. (Tr. at 385-86.)

*Dr. Saar - State Agency Reviewing Psychologist*:

On October 2, 2008, Dr. Timothy Saar, Ph.D., a licensed psychologist, completed a form PRT, on which he, too, opined that Claimant's depression and anxiety were non-severe impairments. (Tr. at 413-26.) He found that Claimant's mental impairments resulted in mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace, but no episodes of decompensation of extended duration. (Tr. at 423.)

9

*Mari Sullivan Walker - Psychological Evaluation & Intellectual Testing*:

Mari Sullivan Walker, M.A., a licensed psychologist, conducted a psychological evaluation and intellectual testing on May 21, 2010, at the request of Claimant's counsel. (Tr. at 497-506.) Claimant reported nervousness, excessive worry, anxiety, depression, irritability, crying spells, a desire to be left alone, cries easily, an aversion of noises, an aversion to crowds, trouble concentrating, difficulty in making decisions, loss of interest in pleasurable activities, and forgetfulness, frequent nightmares, and panic attacks. (Tr. at 497-98.) Regarding her education, Claimant reported that she began school at the age of six, was retained once in the first grade, was enrolled in special education classes, was a poor student, and dropped out of school after completing the sixth grade. (Tr. at 499.) She explained that her family moved to Logan County after she completed the sixth grade, that she was nervous about attending the new school, and decided to quit. (Id.) Claimant stated that she neither visited friends, neighbors, or relatives, nor attended church. (Id.) She indicated that at times, she required assistance getting dressed. (Id.) Claimant also reported that it took her four attempts to pass the written portion of the driving exam. (Id.)

Intellectual testing on the WAIS IV revealed a full scale IQ score of 50, a verbal comprehension IQ of 61, a perceptual reasoning IQ of 52, a working memory IQ of 60, and a processing speed score of 50. (Tr. at 500.) During testing, Claimant readily understood instructions, maintained an appropriate attitude, and maintained good interest and effort, but was impulsive and poorly planned her approach to assessment tasks. (Id.) She seemed overwhelmed when confronted with difficult items and failed to recognize errors or failures. (Id.) Ms. Walker opined that Claimant's full scale IQ fell in the extremely low classification of functioning. (Tr. at 506.) Claimant read at a 2.4 grade level, spelled at a 2.3 grade level, and performed math at a 2.2 grade level (Tr. at 502.)

Ms. Walker diagnosed major depressive disorder, recurrent, severe with psychotic features; generalized anxiety disorder; panic disorder with agoraphobia; dyssomnia NOS; rule out posttraumatic stress disorder; and rule out mild mental retardation. (Tr. at 505.) She assessed a GAF of 44. (Id.) Ms. Walker opined that due to Claimant's "current level of intellectual functioning, her level of academic achievement, and the severity of her psychological symptoms...she is incapable of sustaining steady gainful employment of even the light or sedentary type." (Tr. at 506.)

Ms. Walker also completed a form Medical Assessment of Ability to do Work Related Activities (Mental), on which she opined that Claimant had no ability to perform work-like activities, with the exception of poor ability to relate to co-workers, maintain personal appearance, and understand, remember, and carry out simple job instructions. (Tr. at 507-08.)

*Dr. Omar Hasan*:

Claimant treated with Dr. Hasan, a psychiatrist and neurologist, beginning in February, 2008. (Tr. 393-96, 397-98, 427-29, 444-49, 450-52, 461-62, 474-76, 517-19, 520-35.) Her first examination by Dr. Hasan was on January 28, 2008, at the request of the DHHR. (Tr. at 387-89.) Claimant reported that her husband had died in November, 2007, and that she had difficulty coping with his loss. (Tr. at 387.) She also reported decreased sleep, energy, and concentration, a variable appetite, and feelings of loneliness at times. (Id.) Claimant indicated an increased level of anxiety and panic symptoms on a nearly daily basis, accompanied by episodes of nervousness, anxiousness, and feelings that something bad was going to happen. (Id.) Claimant stated that she completed the fifth grade in school and never worked. (Tr. at 388.) On mental status exam, Dr. Hasan observed that Claimant was cooperative and pleasant, was alert and oriented, had a not too good mood and dysphoric affect, had fair to partial judgment and insight, exhibited an increased level of anxiety and psychomotor activity, and was of average intelligence. (Id.) He diagnosed major depressive disorder,

11

panic disorder, and bereavement, and assessed a GAF of 50. (Id.) Dr. Hasan recommended antidepressant therapy, counseling, and a mood stabilizing medication. (Id.)

Claimant began treatment with Dr. Hasan on April 23, 2008, when she became eligible for Medicaid. (Tr. at 394-95.) Dr. Hasan prescribed Paxil 20mg at bedtime, Xanax 1mg, and gave her samples of Invega 3mg at bedtime. (Tr. at 395.) On May 28, 2008, he referred her to Logan-Mingo Area Mental Health for counseling, as their services were closer and more economical for Claimant. (Tr. at 396.) Dr. Hasan stated that she then was taking Paxil 20mg at bedtime, Xanax 1mg three times a day, and Invega 6mg at bedtime. (Id.) Katherine Lynch, M.A., saw Claimant on one occasion for individual counseling. (Id.)

On July 2, 2008, Tamara Richmond, M.S.P.A., PA-C, increased Claimant's Paxil to 30mg and continued her Invega and Xanax. (Tr. at 398.) She was instructed to continue counseling with Ms. Lynch. (Id.)

Dr. Hasan re-evaluated Claimant on October 15, 2008. (Tr. at 427-29.) Claimant continued to have symptoms of anxiety and depression, which Dr. Hasan found were better with medication. (Tr. at 427, 429.) She also had some decreased sleep, but it was better than before. (Tr. at 427.) Her energy remained decreased, but also improved, and her appetite and concentration were returning to baseline, but were not quite there. (Id.) Claimant reported excessive worry and panic symptoms, which occurred in public places, but were better due to medication. (Id.) He diagnosed major depressive disorder, panic disorder, and bereavement complicated, and continued the assessed GAF of 50. (Tr. at 428.)

On October 28, 2008, Dr. Hasan completed a form PRT, on which he opined that Claimant's depression and anxiety were severe impairments, but were not expected to last twelve months. (Tr. at 444-49.) He opined that Claimant's mental impairments resulted in moderate limitations in

maintaining activities of daily living, social functioning, concentration, persistence, and pace, as well as three episodes of decompensation, each of extended duration. (Tr. at 448.) He also completed a form Medical Assessment of Ability to do Work-Related Activities (Mental), on which he opined that Claimant had poor ability (meaning seriously limited but not precluded) to deal with the public, interact with supervisors, deal with work stresses, function independently, relate predictably in social situations, and understand, remember, and carry out simple job instructions. (Tr. at 450-52.) The remaining functions and abilities were rated as fair. (Id.)

    Dr. Hasan next examined Claimant on March 4, 2009, at which time she reported having experienced two panic attacks secondary to her daughter having been ill. (Tr. at 462.) Claimant otherwise reported that she was doing better. (Id.) Dr. Hasan diagnosed major depressive disorder and anxiety NOS. (Id.)

    On September 8, 2009, Claimant reported that she was doing fair, with decreased energy and concentration. (Tr. at 475.) An Epworth Sleepiness Scale was elevated at 19 out of 24. (Id.) Claimant reported increased daytime sleepiness and decreased attention and concentration. (Id.) He therefore, prescribed Adderall 5mg. (Id.)

    Claimant reported on December 1, 2009, that her brother died in November, 2010, and that she had remarried. (Tr. at 519.) Her mood remained decreased and her anxiety remained increased. (Id.) Dr. Hasan diagnosed major depressive disorder, anxiety NOS, and bereavement. (Id.) He noted that Claimant appeared to have been doing well with her increased social support, and therefore, continued her present dose of medications. (Id.) On January 27, 2010, Claimant reported that she was coping with her brother's death but that married life was going well. (Tr. at 518.) She continued to report a decreased mood and mild increased anxiety. (Id.) Her sleep overall was doing better. (Id.)

    On June 17, 2010, Dr. Hasan completed a further form Medical Assessment of Ability to do

Work-Related Activities (Mental), on which he opined that Claimant had poor ability to deal with the public and work stresses. (Tr. at 520-21.) Dr. Hasan also opined on a form PRT that Claimant had moderate difficulties in maintaining activities of daily living; marked difficulties in maintaining social functioning, concentration, persistence, or pace; and three episodes of decompensation, each of extended duration.[2] (Tr. at 531.)

Knee Impairments:

*MRI - Right Knee*:

An August 21, 2001, MRI of Claimant's right knee revealed a small amount of fluid along the anterolateral aspect of the knee joint, degenerative changes along the lateral meniscus, and fatty changes involving the bones, but intact tendons and muscles and no meniscal tears. (Tr. at 259.)

*Dr. Bellam - Treatment Notes*:

Claimant was treated at Community Health Foundation and Dr. Bellam, primarily for hypertension and high cholesterol, but also for complaints of occasional back pain. (Tr. at 260-331, 332, 374-83, 430-43, .) On November 19, 2007, Dr. Bellam reported that Claimant had nervousness, anxiety attacks, back pain, leg pain, swelling of the feet, and shortness of breath. (Tr. at 332.) He noted that her husband had passed away recently. (Id.) Dr. Bellam noted that Claimant weight 219 pounds, and observed that she had lumbosacral spasms and found that she had tenderness to the lumbosacral spine. (Id.) Forward bending was limited to 60 degrees and there was 1+ edema of the feet. (Id.) He diagnosed hypertension, Type II diabetes, degenerative joint disease, and chronic anxiety. (Id.) He opined that Claimant was disabled to these medical problems and that she "direly needs any assistance available that will assist her with her daily living." (Id.)

---

[2] The undersigned notes that several pages were missing from the Administrative Transcript regarding the form PRT and the form Medical Assessment of Ability to do Work-Related Activities (Mental), as completed by Dr. Hasan. (Tr. at 520-35.)

*Dr. Egnor - Physical RFC Assessment*:

On January 30, 2008, Dr. James Egnor, M.D., a state agency reviewing physician, completed a form Physical Residual Functional Capacity Assessment ("Physical RFC"), on which he opined that Claimant's chronic pain, history of degenerative joint disease, diabetes, high blood pressure, high cholesterol, and Bell's Palsy limited her to performing light exertional work, with occasional postural limitations and an avoidance of extreme cold and vibration. (Tr. at 347-54.) Dr. Egnor opted not to accept her treating physician's opinion that she was disabled, and noted that though she had several problems, none were of listing severity. (Tr. at 353.) He noted that although Claimant reported extreme pain, she was moderately active in her activities of daily living. (Tr. at 353-54.)

*Dr. Wirts - Physical RFC Assessment*:

Dr. Amy Wirts, M.D., another state agency reviewing physician, completed a further form Physical RFC, on which she opined that Claimant's left knee strain and generative changes of the lateral meniscus, as well as her chronic pain and history of degenerative joint disease, diabetes, hypertension, high cholesterol, and Bell's Palsy, limited her to performing light exertional work, with occasional postural limitations and an avoidance of extreme cold, vibration, and hazards. (Tr. at 399-406.) Dr. Wirts specifically acknowledged Claimant's degenerative changes along the lateral meniscus, as reported by MRI on August 21, 2001, in conjunction with her morbid obesity, chronic pain, and history of degenerative joint disease. (Tr. at 404.) She opined that Claimant's allegations did "not meet listing level severity using SSA criteria." (Tr. at 405.)

*Knee X-Ray*:

On January 5, 2010, an x-ray of Claimant's right knee demonstrated moderately severe degenerative narrowing of the medial femorotibial compartment with articular sclerosis and marginal osteophytes. (Tr. at 473.) The lateral and patelliofemoral compartments revealed milder

degenerative change. (<u>Id.</u>) The left knee showed moderate degenerative narrowing of the medial femorotibial compartment with articular sclerosis. (<u>Id.</u>)

> <u>Dr. McCleary - Treatment Notes</u>:[3]

On February 22, 2010, Dr. Robert McCleary, D.O., examined Claimant for complaints of bilateral knee osteoarthrosis. (Tr. at 493-94.) Claimant rated her pain at a level six out of ten. (Tr. at 493.) Dr. McCleary noted that Claimant weighed 222 pounds and that she had global knee pain, mild ballottable patellar and suprapatellar pouch effusion, pain over the medial joint space, and mild instability at 30 degrees of valgus stress test. (Tr. at 494.) He also noted that x-rays demonstrated medial joint space collapse. (<u>Id.</u>) He diagnosed bilateral knee osteoarthrosis of the bilateral medial compartments, and injected 6 mg of Decadron and 2 ml of 2% lidocaine. (<u>Id.</u>)

On June 9, 2010, Claimant rated her pain at a level six and Dr. McCleary noted that the last injection seemed to do fairly well. (Tr. at 547.) On exam, Dr. McCleary noted that she had full knee range of motion, mild ballotable patella and suprapatellar pouch effusion, and a continued amount of extreme pain over the medial joint space. (<u>Id.</u>) He again diagnosed bilateral knee osteoarthrosis, gave her another injection in each knee, and prescribed Lortab for pain. (<u>Id.</u>)

Finally, on November 3, 2010, Claimant reported her pain at a level seven and Dr. McCleary noted that there were no changes in her knees since February 22, 2010. (Tr. at 546.) On examination, Claimant had full knee range of motion, multiple sites of patellar effusion, pain over the medial joint space bilaterally, positive crepitation of the patellofemoral joint, and 4/5 muscle strength. (<u>Id.</u>) Due to increased sugar levels, Dr. McCleary injected only half the dosing of the injections. (<u>Id.</u>) He stated

---

[3] Claimant submitted Dr. McCleary's treatment notes to the Appeals Council after the ALJ issued her decision. (Tr. at 546-50.) The ALJ considered the additional evidence and found that the information did not provide a basis for changing the ALJ's decision. (Tr. at 1-2.) The Appeals Council did not explain its decision or make any findings as to the evidence.

that they would "try to hold off on surgery, but if the next injection is not beneficial, I am recommending arthroscopy on the joints." (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant first argues that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that she met the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05. (Document No. 10 at 1, 9-14.) Specifically, Claimant asserts that in reaching this decision, the ALJ erred in finding that Claimant did not suffer a listed impairment because Ms. Walker's reported IQ scores were invalid and her diagnosis included only a "rule out mild mental retardation." (Id. at 10-11.) Claimant contends that a diagnosis of mental retardation is not required to meet a listing and that Ms. Walker reported that the scores were valid. (Id. at 11.) Additionally, Claimant asserts that the ALJ erred in finding that her school records demonstrated a lack of special education classes and good grades in the fifth and sixth grades. (Id.) Claimant questions the validity of her school records and notes that though passing grades were reported in the third grade, she was absent half the year. (Id.)  Claimant also asserts that the ALJ erred when she relied on Claimant's inability to recall whether she was in special education classes. (Id.)

Finally, Claimant asserts that the ALJ completely ignored the opinion of Dr. Clark, who opined that her impairments met or equaled the Listing of Impairments. (Id. at 12.) She requests that the Court take judicial notice that Dr. Clark was a reviewing psychiatrist for the Department of Health and Human Resources and served as a state agency psychiatrist for the West Virginia Disability Determination Section. (Id. at 12-13.) Claimant urges the Court to find that Dr. Clark did not lose her expertise in Social Security Disability evaluation when she performed a medical review for the State Medicaid agency instead of for the State Disability Determination Section. (Id. at 13.)

Nevertheless, even if the ALJ was not required to adopt Dr. Clark's opinion, Claimant asserts that she was required to discuss it and indicate the weight she gave it in reaching her decision. (Id.)

In response, the Commissioner argues that contrary to Claimant's arguments, her IQ scores did not establish mental retardation. (Document No. 11 at 13.) He first notes that no mental health providers believed that Claimant had mental retardation. (Id.) Claimant was not diagnosed with mental retardation, rather she was diagnosed with only borderline intellectual functioning. (Id.) The definition of borderline intellectual functioning, as stated in the DSM-IV, requires that Claimant not have mental retardation. (Id.) The Commissioner also asserts that school records showed that Claimant never participated in special education classes, and performed well in the fifth and sixth grades. (Id.) The Commissioner notes that Claimant obtained her driver's license by passing written and driving examinations and failed to have significant cognitive deficits on mental status examinations. (Id.) Furthermore, Drs. Saar and Harlow both opined that Claimant did not meet Listing 12.05. (Id.)

The Commissioner contends that Claimant's IQ scores were undermined by Ms. Durham's finding that she gave little effort, gave up easily, and failed to attempt to answer more difficult questions. (Id.) Claimant reported significantly more serious symptoms than she ever reported to Ms. Walker, who examined her on one occasion. (Id.) Accordingly, the Commissioner asserts that Claimant failed to meet her burden of proving that she was mentally retarded, and therefore, that the ALJ's decision is supported by substantial evidence of record.

In reply, Claimant asserts that when the Commissioner re-wrote the mental impairments listings, the Commissioner did not adopt the DSM-IV's definition for mental retardation, and therefore, the Commissioner may not rely on the definition to show that Claimant did not meet the Listing for mental retardation. (Document No. 14 at 1.)

18

Claimant also argues that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in concluding that she could perform unlimited standing and walking, despite her complaints of knee pain. (Document No. 10 at 1, 14-19.) Claimant asserts that although the ALJ found that her obesity was a severe impairment, she failed to consider Claimant's obesity in considering whether her arthritic symptoms were more severe than was suggested by the objective evidence given her morbid obesity, as was required by Social Security Ruling 02-1p. (Id. at 16-17.) Furthermore, Claimant asserts that the ALJ erred in relying on the opinions of the state agency physicians, Drs. Egnor and Wirts, because they were unaware of her moderately severe degenerative narrowing of the medial femorotibial compartment of the right knee, with articular sclerosis and marginal osteophytes, because the condition did not appear until January 5, 2010, by x-ray. (Id. at 17.) Finally, Claimant asserts that the ALJ erred in finding no objective evidence of Claimant's knee pain. (Id. at 18.) She states that Dr. McCleary noted on June 9, 2010, that Claimant experienced an extreme amount of pain over the medial joint space. (Id.)

In response, the Commissioner asserts that Claimant's symptoms alone, were insufficient to establish disability. (Document No. 11 at 16.) The ALJ properly considered Claimant's pain and credibility and concluded that she was not credible entirely. (Id. at 17.) The Commissioner next asserts that the ALJ was entitled to consider the opinions of Drs. Egnor and Wirts because at the time of their review, the record contained diagnostic testing confirming a knee impairment. (Id.) The Commissioner notes that Dr. Wirts specifically considered Claimant's knee impairment and that the ALJ considered the record as a whole. (Id.) Finally, the Commissioner asserts that the ALJ specifically discussed Claimant's obesity. (Id. at 18.) The Commissioner contends however, that there was no evidence that Claimant's obesity precluded her from performing a limited range of light work, with limited postural movements. (Id.) Furthermore, the Commissioner asserts that Claimant

19

failed to assert in her application or at the hearing, that her obesity impaired her ability to work. (Id.) Accordingly, the Commissioner asserts that the ALJ's decision is supported by substantial evidence of record and that Claimant's arguments are without merit. (Id. at 18-19.)

In reply, Claimant asserts again that the state agency physicians had only a seven year old MRI report of Claimant's right knee to determine the severity of her arthritis, and not the January, 2010, x-rays. (Document No. 14 at 1.) Claimant also asserts that the ALJ failed to discuss medical evidence that demonstrated that she had moderately severe arthritis in the right knee and suffered extreme knee pain five months prior to the ALJ's decision. (Id.)

After briefing was complete, Claimant submitted a Memorandum Regarding Supplemental Authority, in which she requests that the Court remand the matter to consider the treatment records from Dr. McCleary from February 22, 2010, through November 3, 2010, which were submitted to the Appeals Council. (Document No. 15.) Claimant states that these records concern her bilateral knee osteoarthritis and were for a period preceding the ALJ's decision. (Id. at 1-2.) She surmises that if her knee condition precluded prolonged standing and walking, she would have been found disabled under the Grids. (Id. at 2.) Citing Meyer v. Astrue, 662 F.3d 700 (4th Cir. Dec. 2, 2011), Claimant therefore, asserts that remand to the ALJ for analysis of her treating physician's records is required. (Id.)

In response, the Commissioner asserts that Claimant waived her argument of remand based on new and material evidence based on her failure to raise the argument earlier (Document No. 16 at 1-2.) Even if Claimant did not waive her argument, the Commissioner asserts that Meyer is inapplicable to the instant case because the evidence did not identify specific work-preclusive limitations and because it was neither new nor material. (Id. at 2.) He asserts that the evidence does not identify any additional functional limitations that already were included in the record. (Id. at 3.)

20

Accordingly, the Commissioner urges that remand is not necessary under the circumstances of this case. (<u>Id.</u> at 3.)

<u>Analysis</u>.

1. <u>Listing 12.05</u>.

Claimant first alleges that the ALJ erred in not finding that she met Listing Impairment 12.05. (Document No. 10 at 1, 9-14.)  "The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, <u>see</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2010). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to  significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment  before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2010). The required level of severity for Listing 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR
     D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting
in at least two of the following:
        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration.

Because the evidence does not establish that Claimant was dependent on others for personal needs or that she had marked restrictions or repeated episodes of decompensation, the ALJ focused her analysis on the absence of deficits in adaptive behavior and on the verbal, performance, and full scale IQ scores. To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2010). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2010). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the
> significant work-related limitation of function requirement of section 12.05C.
> Further, the Secretary has defined a severe impairment or combination of
> impairments as those which significantly limit an individual's physical or mental
> ability to do basic work activities. The Secretary's finding that Luckey suffers from
> a severe combination of impairments also establishes the second prong of section
> 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, and as stated by the ALJ, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 3044 (Mark H. Beers,

M.D. & Robert S. Porter, M.D., eds., 19th ed. 2011) (defining mental retardation, now referred to as "intellectual disability," as "significantly subaverage intellectual functioning (often expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following: communication, self-direction, social skills, self-care, use of community resources, and maintenance of personal safety. Management consists of education, family counseling, and social support).[4] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting. Id. at 40. The Regulations make clear that Listings 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

*Listing 12.05 Introductory Language Requirement*:

In her decision, the ALJ concluded that Claimant did not meet Listing 12.05. (Tr. at 22-24.)

---

[4] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning.  Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51; severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

Regarding the introductory language of the Listing, the ALJ concluded that the record did not establish an onset of the impairment prior to age 22, as required by the initial language of 12.05. In other words, the ALJ found that Claimant did not have any deficits in adaptive functioning prior to the age of 22. In reaching this decision, the ALJ relied on Claimant's assertion that she was unsure whether she participated in special education classes when in school. (Tr. at 23.) Although Claimant reported to Ms. Walker that she was in special education classes and testified at the hearing that she was unsure whether she took the classes, Claimant's school records failed to indicate her participation in special education classes, though she was retained in the first grade. (Tr. at 237-39.) Furthermore, Claimant reported on her form Disability Report - Adult, that did not attend special education classes. (Tr. at 189.) Although she testified as to some difficulty reading, Claimant also reported on forms that she could read and understand English, count change, pay bills, and use a checkbook and money orders. (Tr. at 189, 215.) The school records also indicate that Claimant performed well in the fifth and sixth grades, despite her statement to Ms. Walker that she was a poor student. (Tr. at 24, 237-39.) As the Commissioner asserts, the various mental status exams failed to reveal any significant cognitive deficits. Although a specific diagnosis of mental retardation is not required to meet or equal Listing 12.05, the undersigned notes that Mr. McDaniel diagnosed borderline intellectual functioning and Ms. Walker diagnosed rule out mild mental retardation. (Tr. at 392, 505.) Accordingly, the undersigned finds that Claimant has failed to establish deficits in adaptive functioning prior to the age of 22, and therefore, that the ALJ's decision in this regard is supported by substantial evidence.[5]

_____

[5] Claimant also alleges that the ALJ erred in not addressing Dr. Hoback Clark's opinion that Claimant met a Listing. Dr. Hoback Clark's opinion consists of a checked box that Claimant met or equaled a Listing Impairment. (Tr. at 386.) She did not indicate which Listing Claimant met. There is no explanation for Dr. Hoback Clark's opinion. Accordingly, the undersigned finds that while it would have been preferable for the ALJ to have addressed the opinion, her failure to do so

*Listing 12.05(A) and (D)*:

Regarding paragraph A of Listing 12.05, the ALJ concluded that Claimant was capable of caring for her personal needs. The undersigned finds that the record clearly demonstrated Claimant's capability of caring for her own personal needs without being completely dependent on others. The record demonstrated that she required some assistance, at times, with functions such as putting on her socks and shoes and washing her hair. Accordingly, the undersigned finds that the ALJ's finding as to paragraph A is supported by substantial evidence of record.

Regarding paragraph D of Listing 12.05, the ALJ concluded that Claimant had only mild restrictions in maintaining activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. at 22.) Claimant does not dispute this finding. The undersigned finds that this finding is supported by substantial evidence of record.

*Listing 12.05(B) and (C)*:

Regarding paragraphs B and C of Listing 12.05, the ALJ found that Claimant neither had a valid IQ score of 59 or less (paragraph B), nor a valid IQ score between 60 and 70 (paragraph C). The ALJ acknowledged the IQ scores obtained by Mr. McDaniel, Ms. Durham, and Ms. Walker. (Tr. at 23-24.) She also acknowledged Dr. Hasan's notation that Claimant was of average intelligence. (Tr. at 23.) The ALJ noted that Ms. Durham considered her scores (verbal IQ of 58, performance IQ of 52, and full scale IQ of 51) invalid because Claimant put forth little effort on testing and gave up easily. (Id.) Ms. Durham also noted that Claimant had obtained her driver's license via written and driving exams. (Tr. at 23-24.) The ALJ further noted that Ms. Walker considered her IQ scores

is harmless. Dr. Hoback Clark's opinion was on an issue reserved to the Commissioner and was not accompanied by any supporting documents or statements.

(verbal IQ of 61, performance IQ of 52, and full scale IQ of 50) as valid. Nevertheless, the ALJ declined to accept Ms. Walker's scores as a valid indicator of her intellectual functioning. (Tr. at 24.) The ALJ noted that Ms. Walker diagnosed "rule out mild mental retardation" and recommended that Claimant be examined by a neurologist. (Id.) Claimant was examined by a neurologist, Dr .Hasan, beginning in 2008, and continued to be treated by him for her depression, anxiety, and bereavement. (Id.) Because Dr. Hasan never diagnosed a learning disorder or cognitive impairment, and continued to identify her intelligence as average, the ALJ concluded that Ms. Walker's IQ scores were invalid. (Id.)

The undersigned finds that the ALJ erred in discounting Mr. McDaniel's and Ms. Walker's IQ scores. Though she relied on Dr. Hasan's statement that he estimated Claimant's intelligence was average, Dr. Hasan nevertheless only estimated her intelligence and never conducted any formal intellectual testing. Dr. Hasan's estimate therefore, is not as valid an indicator as were the IQ scores obtained by testing. Furthermore, the record is not entirely clear as to whether Dr. Hasan had knowledge of Mr. McDaniel's or Ms. Walker's intellectual testing results. The ALJ did not give any definitive reason for discounting the scores obtained by Mr. McDaniel, and Mr. McDaniel did not indicate whether the scores were valid or invalid. Regarding Ms. Walker, the undersigned finds that the reasons cited by the ALJ support her finding of a lack of significant deficits in adaptive functioning, but do not support necessarily a flat out rejection of Ms. Walker's scores, which she determined were valid. Nevertheless, because Claimant failed to establish significant deficits in adaptive functioning, the undersigned finds that the ALJ's error is harmless, as Claimant has not satisfied the requirements of the introductory language of 12.05.

2. Knee Impairment:

Claimant also asserts that the ALJ erred in not finding any limitations in her ability to stand

or walk. (Document No. 10 at 19.) In her decision, the ALJ acknowledged Claimant's testimony that she was referred to an arthritis doctor and had x-rays done on her knees, and that she was examined by Dr. McCleary every three months for her knees. (Tr. at 25.) Her knee pain had persisted for two years and was getting worse. (Id.) She reported that she took steroid shots in her knees and that she would require surgery on her knees in the future. (Id..)She indicated that she did not exercise and walked only a little due to pain. (Id.) She experienced knee pain on a daily basis and reported that her knees popped and cracked. (Tr. at 26.) She rated her knee pain at a level eight all day and stated that she had to sleep a lot on her side due to aching pain in her knees and legs. (Id.) Her knees bothered her constantly every night. (Id.) Claimant testified that she probably could walk 50 feet and that if she sat for an extended period of time, she experienced discomfort in her back and legs. (Id.)

The ALJ also acknowledged the objective evidence concerning Claimant's bilateral knees, including the August 21, 2001, MRI and the January 5, 2010, x-rays. (Tr. at 27.) Additionally, she summarized and considered the treatment notes from Drs. Bellam and McCleary. (Id.) Finally, the ALJ acknowledged Claimant's obesity and how it affected all of her impairments. (Tr. at 22, 26.) She noted that Claimant failed to adhere to the recommendation of her physicians to follow a low salt, low cholesterol diet, to decrease her weight, and to exercise. (Tr. at 26.) After considering all the evidence of record, the ALJ concluded that Claimant's symptoms were disproportionate to the objective findings. (Tr. at 27.) The ALJ noted that Claimant's posture and gait appeared normal and that she did not use any canes, walkers, or other aids to ambulate. (Id.)

The ALJ rejected Dr. Bellam's opinion of disability as it was an opinion on an issue reserved to the Commissioner. (Tr. at 30.) Additionally, the ALJ concluded that Dr. Bellam's opinion was inconsistent with the record as a whole. (Id.) She gave significant weight to the opinions of Drs. Egnor and Wirts because they were consistent with the medical evidence of record. (Tr. at 31.)

The undersigned finds that the ALJ properly assessed Claimant's credibility as to the symptoms concerning her knees. Although Claimant testified to limitations resulting from her knee impairments, the other evidence of record failed to establish any limitations not accounted for by the ALJ. The undersigned also finds that the ALJ properly relied on the opinions of the state agency reviewing physicians, Drs. Egnor and Wirts. Claimant correctly points out that their opinions were rendered prior to the January, 2010, x-rays. Nevertheless, the Commissioner also correctly points out that Dr. Wirts specifically considered Claimant's knee impairment. Dr. Wirts considered the degenerative changes of the lateral meniscus to be her diagnosis secondary to her morbid obesity. (Tr. at 399.) She discussed the August, 2001, MRI in relation to her morbid obesity with chronic pain and history of degenerative joint disease. (Tr. at 404.) Although the x-rays identified a more significant impression than did the MRI, the evidence failed to establish any further limitations resulting therefrom. Consequently, the ALJ did not err in relying on the state agency physicians' opinions.

Finally, the undersigned finds that the ALJ did consider Claimant's obesity in assessing her residual functional capacity. As Claimant notes, Social Security Ruling 02-1p, required the ALJ to consider the combined effects of her obesity with other impairments, including her knee impairments. Although the ALJ did not specifically discuss in her opinion, Claimant's obesity and how it may have impacted her arthritic symptoms, the ALJ found her obesity as a severe impairment, discussed it in relation to the Listing of impairments, acknowledged Claimant's testimony regarding obesity, and specifically stated that Claimant's obesity was considered "in reaching all conclusions herein." (Tr. at 20, 22, 25-26.) There was no evidence however, to indicate that any physician placed any limitations on Claimant's activities due specifically to her obesity. On December 18, 2009, it was mentioned in a progress note from Family Healthcare Associates that arthritis in the knees and

weight gain were suspected. (Tr. at 512.) Presumably, the weight gain contributed to the arthritis in the knees. Nevertheless, the record was void of any limitations not considered by the ALJ, and Claimant did not identify any further specific limitation resulting from her obesity.

3. Evidence Submitted to the Appeals Council:

      In her Memorandum Regarding Supplemental Authority, Claimant seems to assert that remand is required pursuant to the holding in Meyer, to determine whether Dr. McCleary's treatment notes reasonably would have resulted in a different decision by the ALJ. (Document No. 15.) In Meyer, the Fourth Circuit held that although the Appeals Council is not required to explain its rationale for denying review of new and material evidence, when an analysis by the Appeals Council would be helpful to the reviewing court, remand is allowed. Meyer, 662 F.3d at 707. In Meyer, the claimant had submitted new and material evidence from his treating physician, which described claimant's back injury, surgery, and treatment, and set forth specific limitations resulting therefrom. Id. at 703-04. The ALJ emphasized in his opinion that there was a lack of restrictions placed on the claimant by a treating physician. Id. at 707. The Fourth Circuit therefore, found that the evidentiary gap played a role in the ALJ's decision. Id. Given that no fact finder had made any findings regarding the new and material evidence from the treating physician, the Fourth Circuit concluded that remand was required by the fact finder as to the probative value of the treating physician's evidence. Id.

      The undersigned finds that the facts in this case are distinguishable from those in Meyer. In this case, Dr. McCleary's treatment notes did not establish any specific limitations on Claimant resulting from her knee impairments. Rather, the evidence indicates that surgery would be considered if the next injection treatment was not beneficial. Furthermore, the exam notes revealed 4/5 muscle strength and full knee range of motion, accompanied with effusion, swelling, pain, and

crepitation. (Tr. at 546.) Accordingly, the undersigned finds that the evidence, while it may have been new, is not material, as it reasonably would not have changed the ALJ's decision.[6] Furthermore, the undersigned finds that Claimant has not demonstrated good cause for her failure to submit the evidence to the ALJ prior to her decision. The evidence was dated February 22, 2010, June 9, 2010, and November 3, 2010. (Tr. at 546-50.) The ALJ's decision was dated November 12, 2010. (Tr. at 18-35.) There is no indication that either Claimant or her attorney neither requested at the administrative hearing on September 23, 2010, that the record remain open for the submission of further evidence, nor requested that the record remain open after her last visit with Dr. McCleary. Accordingly, the Court finds that contrary to Claimant's argument, the treatment notes from Dr. McCleary do not warrant remand.[7]

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District Court confirm and accept the foregoing findings, **DENY** Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings

---

[6] To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). In *Borders*, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence. *Id.*

[7] The Commissioner argues that Claimant waived any argument regarding the submission of new and material evidence because she did not raise it previously. (Document No. 16 at 1-2.) The undersigned notes however, that although she did not cite *Meyer*, Claimant alluded to such an argument in her Brief in Support of Claim. (Document No. 10 at 18-19.) Accordingly, the undersigned does not find that Claimant waived entirely her claim for remand based on new and material evidence.

30

(Document No. 11.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 6, 2012.

R. Clarke VanDervort
United States Magistrate Judge

31